IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **Shelley Eberle,** | : | |
| Plaintiff, | : | |
| | | Case No. 3:19-cv-00345-TPK |
| vs. | : | |
| **Andrew Saul,** | : | Magistrate Judge Kemp |
| **Commissioner of** | | |
| **Social Security,** | : | |
| Defendant. | : | |

**OPINION AND ORDER**

Plaintiff Shelley Eberle filed this action seeking review of a final decision of the Commissioner of Social Security. That decision, issued by the Appeals Council on September 16, 2019, denied her applications for social security disability benefits and supplemental security income. Plaintiff filed a statement of errors on March 4, 2020 (Doc. 10) to which the Commissioner responded on May 13, 2020 (Doc. 13). The parties have consented to final disposition of this case by a United States Magistrate Judge. For the following reasons, the Court will **SUSTAIN** the statement of errors and remand the case to the Commissioner for further proceedings.

I. INTRODUCTION

Plaintiff protectively filed her applications on August 11, 2016 and August 22, 2016 alleging that she became disabled on April 21, 2016. After initial administrative denials of her claims, Plaintiff appeared at a hearing held before an Administrative Law Judge on August 30, 2018. A vocational expert, William J. Braunig, also testified at the hearing.

The Administrative Law Judge issued an unfavorable decision on November 29, 2018. In that decision, he first found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2021 and that she had not worked since her alleged onset date. The ALJ next concluded that Plaintiff suffered from severe impairments including , degenerative disc disease of the cervical spine with radiculopathy, peripheral neuropathy, and depression. However, the ALJ also found that none of these impairments, taken singly or in combination, met the criteria for disability found in the Listing of Impairments.

Moving to the next step of the sequential evaluation process, the ALJ found that Plaintiff could perform a reduced range of light work. He concluded that Plaintiff was capable of the

exertional demands of light work but only occasionally push, pull, or reach overhead with her right upper extremity and crawl, could never climb ropes, ladders, and scaffolds, and could frequently handle, finger, and feel with her right hand. She also had to avoid unprotected heights and dangerous machinery, and could work only at simple, routine tasks but not at production rate pace with only occasional changes to a routine work setting.

The ALJ determined that with these limitations, Plaintiff could not perform her past relevant work as a cake decorator. At the hearing, the vocational expert testified that someone who was limited in this way could do certain light jobs including survey worker, office helper, and merchandise marker. The ALJ accepted this testimony as well as the testimony that these jobs exist in significant numbers in the national economy. As a result, he concluded that Plaintiff was not disabled within the meaning of the Social Security Act.

In her statement of errors, Plaintiff raises a single issue. She argues that the ALJ erred in his evaluation of the medical source evidence and by interpreting the functional meaning of the medical data.

## II. STANDARD OF REVIEW

As this Court said in *Jeter v. Comm'r of Soc. Sec. Admin.*, 2020 WL 5587115, at *1–2 (S.D. Ohio Sept. 18, 2020)**,**

> Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.' " *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance...." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.
>
> The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if

supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.' " *Rabbers,* 582 F.3d at 651 [quotations and citations omitted].

### III.  FACTUAL BACKGROUND

The Court will begin its review of the factual background of this case by summarizing the testimony given at the administrative hearing.  It will then recite the pertinent information found in the medical records.

Plaintiff first testified that she lived with her husband and two children.  She was able to climb stairs slowly and to drive but she had difficulty turning her head.  She could not grip with or elevate her right arm and hand.  She had graduated from high school and also had some college.

When asked about her work history, Plaintiff said that she was a cake decorator from 2003 to 2016.  She was required to lift up to 50 pounds at that job.  She had not looked for work since leaving that job in April of 2016.  She did, however, volunteer with a soccer boosters club.

Plaintiff said that she was in pain on a daily basis, and the more active she was, the worse the pain got.  She could do a few household chores but self-care was very difficult for her.  Occasionally she cleaned houses for extra money but that activity tired her out.  She tried to nap two or three hours every day, and she spent most of her time sitting on the couch.  Plaintiff experienced constant muscle spasms in her right shoulder which sometimes caused her fingers to lock.  She had had surgery but it really did not relieve her symptoms, nor did injections.  She had side effects from various medications and discontinued most of them.

In terms of daily activities, Plaintiff could grocery shop but always took someone with her.  Her children helped with housework as well.  She read and watched television in the evenings.  She could sit for forty minutes and stand or walk for ten to fifteen minutes.  Lifting more than a gallon of milk put a strain on her neck.  She dropped objects and had trouble using her hand for activities like turning a doorknob, fastening buttons, or writing.

Finally, Plaintiff testified that she had been diagnosed with depression in 2017 and was seeing a counselor due to having extended crying episodes.  Those had improved somewhat with the counseling but she was still struggling with depressive symptoms.

The vocational expert, Mr. Braunig, explained that Plaintiff's work as a cake decorator fell under the general classification of a salesclerk for food, and that the job is typically performed at the light exertional level, although Plaintiff performed it at the medium exertional level.  He was then asked questions about a person of Plaintiff's age, education, and experience

who could do light work with various restrictions relating mainly to the use of her right arm and hand.  In response, he testified that the person could not do Plaintiff's past work but could perform jobs such as production assembler, survey worker, and office helper.  Mr. Braunig was then asked how a restriction to simple routine work not done at a production pace and done in a setting where changes occurred only occasionally would affect the ability to do those jobs.  He said that the office helper and survey worker jobs could be done by such a person and that the job of merchandise marker would also be available.  If the person could only occasionally handle, finger, and feel with the right hand, however, there would not be any light or sedentary jobs that could be performed.  The same was true, he said, if the individual were off task 15% of the time.

According to the medical evidence, Plaintiff became a new patient of the Ohio Pain Clinic on April 22, 2016.  She reported constant pain in the neck, right arm, and right hand with moderate weakness and some numbness.  She was diagnosed with cervical radiculopathy and given an interlaminar injection, and it was noted that other modalities of treatment in the past, such as medication, activity modification, and home exercise were ineffective.  Two days later, Plaintiff sought additional treatment for right arm, shoulder, and hand pain.  A CT scan of the cervical spine did not show any acute abnormalities.  She was scheduled for an MRI the following day.  That study showed a protruding disc at C5-6 and a herniation at C6-7.  In May of that year she was again reporting severe neck pain. She was given medications and referred to neurosurgery for an evaluation.   The following month she was seen by a neurologist and reported that her pain had improved through the use of muscle relaxants but she was still having pain on the right side which increased with cervical range of motion and involved the fourth and fifth fingers of her right hand.  The neurosurgeon, Dr. West, reported various positive signs and recommended an EMG study.  That study was done the next month and was positive for mild C8 radiculopathy.  Plaintiff was referred for a second opinion about the need for neck surgery.  During this time, she was also undergoing chiropractic treatment.

On September 8, 2016, Plaintiff saw Dr. Porcelli.  She was still reporting neck, arm, and hand pain.  He noted that an MRI had confirmed nerve root compromise and that conservative treatment had not been successful.  He offered her surgery in the form of a C7-T1 fusion, to which she agreed.  The surgery occurred on October 5, 2016.  In a note dated November 7, 2016, made approximately one month after surgery, Dr. Porcelli reported that Plaintiff reported pain ranging from 3/10 to 5/10 and that she had satisfactory range of motion in all directions.  She still demonstrated some recurrent radiculitis.  He prescribed gabapentin to improve that condition and stated that he did not "want her lifting anything greater than 20 pounds." (Tr. 405).

In 2017 and 2018, Plaintiff was seen by Dr. Manepa at Beavercreek Health Center.  She told Dr. Manepa that the surgery did not substantially improve her symptoms and that she had persistent painful dysesthesia throughout her right arm.  His examination revealed some abnormal findings including partial sensory loss in the right forearm and hand, and he diagnosed cervical radiculitis.  He recommended both medication and physical therapy.  Other studies done in 2018 showed a more pronounced stenosis at C4-5.  A note from June 19, 2018 indicates that Plaintiff said that she was able to walk for 30 minutes without pain, sit for 60 minutes, and stand

for ten minutes, and that various activities including bending, lifting, or prolonged sitting and standing aggravated her condition.  Later notes show that she was hypersensitive to touch on the right upper extremity  and that she showed tenderness over the cervical paraspinals.  Again, a steroid injection had no effect on her pain.  Her stated sitting, standing, and walking capacity was reduced to five minutes each, with lifting less than five pounds, as reflected in an August 9, 2018 note.

Plaintiff also was being treated for depression in 2017 and 2018.  Her psychologist, Dr. Predieri, completed an impairment questionnaire on May 15, 2018 stating that she had seen Plaintiff every two weeks since January 30, 2018, and that Plaintiff's symptoms included appetite disturbance, sleep disturbance, personality change, mood disturbance, emotional lability, loss of interest, feelings of guilt and worthlessness, difficulty concentrating or thinking, social withdrawal, decreased energy, intrusive recollections, and persistent anxiety.  At their sessions, Dr. Predieri had noted depressed mood, restricted affect, and crying.  She believed that Plaintiff's depression was causing hypersomnia and negativity leading to less physical activity and increased pain and that she would be absent from work three times per month.  She would also be distracted by her symptoms two-thirds of the time, and would not be able to work on a sustained basis without being off task 15% of the time or missing work more than two days per month.  (Tr. 591-93).

Finally, state agency physicians evaluated Plaintiff's residual functional capacity.  On September 26, 2016, Dr. Cacchillo concluded that Plaintiff could do light work with various restrictions including the fact that she was limited to occasional crawling and in reaching overhead with either arm, and limited to frequent fingering and handling with the right hand.  Dr. Knierim, who expressed his opinion two months later and who reviewed some additional records not available to Dr. Cacchillo, added an environmental limitation (no exposure to unprotected heights or dangerous machinery) and some additional limits on pushing, pulling, and feeling but otherwise concurred with Dr. Cacchillo's opinion.  There were no state agency opinions about Plaintiff's mental residual capacity, presumably because she did not start treatment for a psychological disorder until after the state agency proceedings were complete.

## IV.  DISCUSSION

There are two parts to Plaintiff's argument.  First, she contends that the ALJ did not properly weigh or evaluate the opinion of Dr. Predieri, Plaintiff's psychologist, both applying an incorrect standard and failing to support his conclusion with substantial evidence.  Second, she argues that the ALJ gave improper weight to the state agency physicians' opinions about her physical capabilities and also gave too much deference to the opinion of Dr. Porcelli which was rendered only four weeks after her neck surgery.  She also notes that there was additional medical evidence from 2018 which suggests that the 2016 evaluations were out of date and did not take the entire record into account.  Given these assertions, it is necessary to review the ALJ's residual functional capacity findings in some detail.

The ALJ first recounted Plaintiff's testimony concerning her symptoms and found that it did not comport exactly with the medical records compiled following her 2016 surgery "which usually demonstrated good strength and range of motion." (Tr. 19). He noted that despite her repeated complaints of pain in 2017 and 2018 and some clinical findings "her strength remained relatively good" and she engaged in only "limited medication use," leading to the conclusion that the record did not "support symptoms as severe as alleged." (Tr. 20). He also noted some inconsistency between the statement she made to her physician about how long she could sit, stand, or walk and the testimony she gave at the administrative hearing. (Tr. 21). The ALJ also concluded that the record did not support Plaintiff's statements about the severity of her mental impairment because "beyond tearfulness and an anxious and depressed mood [her] mental status was within normal limits" and that except for that tearfulness, "the ... therapy records do not reflect abnormalities in her mental status." (Tr. 21). The ALJ also found Plaintiff's activities of daily living to be inconsistent with her reports of disabling symptoms. (Tr. 22). Plaintiff has not directly challenged these findings.

Turning to the opinion evidence, the ALJ first gave great weight to the opinions of the two state agency physicians, reasoning that they were generally consistent with the record. The portions of the record which the ALJ cited were those that showed Plaintiff retained relatively good strength and the fact that Dr. Porcelli had said, four weeks after surgery, that Plaintiff "was able to lift up to 20 pounds, which is consistent with light work." (Tr. 22). After giving only partial weight to the opinion of Plaintiff's chiropractor (something Plaintiff does not contest), the ALJ gave great weight to what he characterized as Dr. Porcelli's opinion that Plaintiff could lift up to 20 pounds. (Tr. 23). Finally, he gave "[p]artial, and not controlling or deferential weight" to Dr. Predieri's opinion. He noted it was based on only four months of treatment and that because the major symptom Dr. Predieri observed during treatment was tearfulness, "the record does not support such extreme absenteeism or off-task limitations" as expressed in that report. *Id*. The Commissioner argues that these various assessments are all supported by substantial evidence, asserting that Dr. Predieri did not provide any support for her conclusions, that her views about how often Plaintiff would miss work or be off task were merely speculative, and that the ALJ adequately accounted for any medical evidence received after the state agency physicians rendered their opinions.

Dr. Predieri was a treating source and her opinion was therefore required to be evaluated under the "treating physician" rule found in 20 C.F.R. §404.1527 as it existed at the time Plaintiff filed her applications for benefits. As this Court has explained,

> a treating physician's opinion is entitled to weight substantially greater than that of a nonexamining medical advisor or a physician who saw plaintiff only once. 20 C.F.R. § 404.1527(c); *see also Lashley v. Secretary of H.H.S.*, 708 F.2d 1048, 1054 (6th Cir. 1983); *Estes v. Harris*, 512 F.Supp. 1106, 1113 (S.D. Ohio 1981). However, in evaluating a treating physician's opinion, the Commissioner may consider the extent to which that physician's own objective findings support or contradict that opinion. *Moon v. Sullivan,* 923 F.2d 1175 (6th Cir. 1990); *Loy v.*

> *Secretary of HHS*, 901 F.2d 1306 (6th Cir. 1990). The Commissioner may also evaluate other objective medical evidence, including the results of tests or examinations performed by non-treating medical sources, and may consider the claimant's activities of daily living. *Cutlip v. Secretary of H.H.S.*, 25 F.3d 284 (6th Cir. 1994). No matter how the issue of the weight to be given to a treating physician's opinion is finally resolved, the ALJ is required to provide a reasoned explanation so that both the claimant and a reviewing Court can determine why the opinion was rejected (if it was) and whether the ALJ considered only appropriate factors in making that decision. *Wilson v. Comm'r of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004).

*Morris v. Comm'r of Soc. Sec.*, 2016 WL 6574158, at *4 (S.D. Ohio Nov. 7, 2016), *report and recommendation adopted,* 2017 WL 1287146 (S.D. Ohio Apr. 6, 2017).

The work-preclusive portions of Dr. Predieri's opinion are, as noted above, related to Plaintiff's ability to perform full-time competitive work activity without either being off task an inordinate amount of time or being absent from work more than twice a month. The ALJ said that these limitations were not consistent with the record, which is described in the ALJ's decision as consisting essentially of "complaints and tearfulness reflected in [the] therapy notes," with no other significant abnormalities in mental status noted. (Tr. 23). The question then becomes whether this rationale is sufficient to support rejecting a treating source opinion.

The Commissioner advances several arguments in support of the ALJ's decision. They include: that the opinion lacked "meaningful explanation," Defendant's Memorandum, Doc. 13, at 6; that the portions of the opinion relating to missing work or being off task are not medical opinions and are vague, *id*. at 6-7; that the treatment history was not lengthy, *id*. at 9; and that the treatment notes provide little support for Dr. Predieri's conclusions, *id*. at 10. It is, of course, true that the Court may consider only those rationales explicitly relied upon by the ALJ in determining if the decision is sustainable, *see Keeton v. Commissioner of Social Sec.*, 583 Fed.Appx. 515, 524 (6th Cir. Oct. 14, 2014), so the Court will confine its analysis to the reasons given by the ALJ, which do not include lack of meaningful explanation of Dr. Predieri's opinion and the assertion that her views do not constitute medical opinions. The Court notes, in passing, that the cases cited by the Commissioner in support of this latter assertion do not support the proposition that the views expressed by mental health professionals on their patients' ability to complete a workday or workweek without interruption from psychologically-based symptoms - even if expressed as the likelihood of the patient being off task or off work altogether - can never constitute medical opinions.

What is left is the ALJ's noting - but not necessarily relying on - the four-month treatment relationship between Plaintiff and Dr. Predieri, and the assertion that the treatment notes show few abnormalities and do not support the "extreme limitations" posited by Dr. Predieri. However, the ALJ engaged in a very selective reading of those notes. Dr. Predieri flagged a number of symptoms which go beyond being tearful during counseling sessions, including not

only the ones listed on the questionnaire and recited above but a restricted affect, pain behavior, excessive sleep, fatigue, and very depressed mood. *See* Tr. 589-90. It is difficult to characterize those notes as demonstrating normal mental functioning, and they contradict the ALJ's statement that the only major symptom noted was tearfulness. Given the brief and largely inaccurate reading of the record reflected in the ALJ's analysis of Dr. Predieri's findings, the Court cannot conclude that the ALJ's findings on this issue are supported by substantial evidence.

It is also worth noting that the ALJ did not, as Plaintiff argues, explain what he meant by the statement that partial weight was given to Dr. Predieri's conclusions, especially when he appears to have rejected them in total. Even if an ALJ correctly concludes that there are inconsistencies between the evidence of record and a treating source opinion, the ALJ may not simply disregard the opinion altogether. *See, e.g., Theurer v. Comm'r of Soc. Sec.*, 2015 WL 9198681, at *10 (S.D. Ohio Dec. 17, 2015), *report and recommendation adopted*, 2016 WL 258643 (S.D. Ohio Jan. 20, 2016) ("the ALJ's finding that the treating source opinions were not well-supported by medically acceptable clinical and laboratory techniques and inconsistent with the other substantial evidence in the case record only entitled her to decline controlling weight to those opinions, not to reject them entirely without further consideration"). Consequently, this issue will require further attention on remand.

Having concluded that the ALJ erred in his consideration of Dr. Predieri's opinion, it is not necessary to devote much discussion to the remainder of Plaintiff's claim. On remand, the additional medical evidence which post-dated the state agency reviewers' opinions can be further explored, and the ALJ should consider whether the isolated statement by Dr. Porcelli, only four weeks post surgery, that he did not want Plaintiff lifting more than twenty pounds is really an opinion as to residual functional capacity and whether it, too, must be reevaluated in light of subsequent evidence that the surgery ultimately provided Plaintiff with little relief.

## V.  CONCLUSION AND ORDER

For the following reasons, the Court sustains the statement of errors (Doc. 9) and **REMANDS** this case to the Commissioner pursuant to 42 U.S.C. §405(g), sentence four.

    **/s/ Terence P. Kemp**
    **Terence P. Kemp**
    **United States Magistrate Judge**